Not Reported in F.Supp., 1996 WL 82484 (E.D.Pa.), 64 USLW 2596, 5 A.D. Cases 444, 14 A.D.D. 634, 7 NDLR P 417

Motions, Pleadings and Filings

United States District Court, E.D. Pennsylvania.
Barry O'BRIEN and Sharon Burk-O'Brien
v.
WERNER BUS LINES, INC. d/b/a Werner Tours, et al.
Civ. A. No. 94-6862.
Feb. 27, 1996.

MEMORANDUM AND FINAL JUDGMENT

HUTTON, Judge.

*1 Presently before the Court are defendants' Motion for Summary Judgment and plaintiffs' opposition. For the reasons that follow, the defendants' motion is granted.

I. BACKGROUND

Plaintiffs, Barry O'Brien and Sharon Burk-O'Brien ("the O'Briens"), instituted this suit against defendants Werner Bus Lines, Inc. d/b/a Werner Tours, Werner Tours, Fred Ochroch, and TX Industries, Inc. under the American with Disabilities Act ("ADA") and the Pennsylvania Human Relations Act ("PHRA").

Defendant, Werner Bus Lines, Inc. d/b/a Werner Tours ("Werner"), is a tour and charter bus company located in Phoenixville, Pennsylvania, which has been in operation for fifty years. (Def.'s Ex. D, ¶¶ 1-2). Defendant Fred Ochroch is the president of Werner (Ochroch Dep. at 15), and defendant TX Industries is a holding company, which holds the stock of Werner. (Ochroch Dep. at 18).

On November 13, 1992, the O'Briens, a blind couple, were waiting at a bus stop in Lansdale, Pennsylvania for a Werner tour bus to take them to Atlantic City, New Jersey. A few weeks prior to this date, Ms. Burk-O'Brien had won tickets to a Kathy Mattei concert in Atlantic City from a radio station. (Burk-O'Brien Dep. at 45, 47). When the Werner tour bus arrived at the Lansdale stop, the driver of the bus informed the O'Briens that he could not allow them to board because of their guide dogs. (O'Brien Dep. at 41-43). At that point, Mr. O'Brien stepped in front of the bus to keep it from departing, and he asked Ms. Burk-O'Brien to go to a nearby drug store and call the police. (O'Brien Dep. at 45-46).

When the police arrived, a policeman spoke with someone on the bus radio who identified himself as Thomas Brynan, the general manager of Werner.[FN1] (Pl.'s Ex. F). The policeman told the O'Briens that, according to Brynan, Werner wouldn't allow the O'Briens to board the bus with their guide dogs. (Dep. at 47-48). After some discussion between the policeman and Brynan and the policeman and the O'Briens, the O'Briens left. (Pl.'s Ex. F).

FN1. Brynan's actual title is vice president. (Brynan Dep. at 11).

When Fred Ochroch, the president of Werner, learned of the incident with the O'Briens, he proceeded to take the following actions. First, he called the O'Briens by telephone to apologize to them. (Ochroch Dep. at 178). Mr. O'Brien answered Mr. Ochroch's call, but refused to take it. (Although Mr. O'Brien had not retained an attorney yet, he told Mr. Ochroch that he was acting on the advice of counsel). (O'Brien Dep. at 86-87). Second, Mr. Ochroch sent a letter of apology to the O'Briens, recognizing Werner's mistake in the matter and sending them four free bus tickets to Atlantic City and two free bus tickets to the Grand Ole Opry in Nashville, Tennessee. (Def.'s Ex. H). (These tickets were later returned by the O'Briens'

counsel). (Ochroch Dep. at 192, 201). Third, Mr. Ochroch apologized publicly to the O'Briens on a television news broadcast. (Ochroch Dep. at 190-91). Fourth, Mr. Ochroch issued a memorandum that advised all Werner bus drivers that blind persons with guide dogs, as well as other disabled persons, were welcome on Werner buses and that Werner drivers should provide any necessary assistance to them. (Def.'s Ex. I). Fifth, Mr. Ochroch directed Werner personnel to speak individually to all bus drivers about their obligation to take blind passengers with guide dogs. (Ochroch Dep. at 179). Sixth, he invited the Montgomery Association for the Blind and the O'Briens to speak to Werner bus drivers and answer questions the drivers had regarding accommodations for blind persons. (Def.'s Ex. K; Ochroch Dep. at 170, 178). (These requests were declined by both the Association and the O'Briens). (Def.'s Ex. F; Ochroch Dep. at 170). Seventh, Mr. Ochroch added a provision in Werner's drivers handbook, explicitly stating Werner's policy that blind people, as well as other disabled people, are welcome on Werner buses and that drivers should provide whatever assistance is necessary to accommodate them. (Def.'s Ex. J). Finally, he initiated discussion about the obligations of Werner drivers to assist disabled persons onto buses at the following semiannual drivers meetings. (Dep. at 164-166).

*2 After the incident with the O'Briens, Werner was contacted by the Interstate Commerce Commission ("ICC"). By letter dated February 8, 1993, the ICC warned Werner that refusing to allow the transportation of disabled persons with guide dogs was a violation of federal law. The Commission requested a specific statement of the corrective action being taken by Werner. In response, Werner explained that it had informed its drivers of Werner's obligations under the ADA and provided the ICC with a copy of the memorandum it had issued to the drivers. (Def.'s Ex. S). Apparently, this response satisfied the Commission, because no further action was taken by it. (Ochroch Dep. at 173-74).

In addition, after the incident, Werner cooperated with a Pennsylvania Human Rights Commission ("PHRC") investigation, which was initiated by a complaint filed by the O'Briens. Werner appeared at conciliation meetings and offered settlement terms to the O'Briens that met with the approval of the PHRC. Nonetheless, the O'Briens failed to attend these meetings or to respond to the proposed settlement terms. (Def.'s Exs. L-P).

At their depositions, both of the O'Briens admitted that they were not aware of any physical alterations to a tour bus that would be necessary to accommodate blind persons with guide dogs. (O'Brien Dep. at 79-80; Burk-O'Brien Dep. at 186; see Def.'s Ex. T ¶ 18). Mr. O'Brien testified that he had never had any trouble riding on a bus and that, when he rides on a bus, he lets his guide dog sit under the seat by his legs. (O'Brien Dep. at 79). Ms. Burk-O'Brien testified that, other than on November 13, 1992, she does not know of any other time when blind persons with guide dogs were not allowed on Werner tour buses. (Burk-O'Brien Dep. at 58-59, 185-86; see Def.'s Ex. T ¶ 27).

During the deposition of Mr. Ochroch, Mr. Ochroch testified that Werner has operated charter buses for various associations for the blind. (Ochroch Dep. at 74-75, 114). Mr. Brynan himself was a driver for one of these charters, and he testified that he had no trouble transporting blind persons with their guide dogs on Werner buses. (Brynan Dep. at 78-79).

## II. DISCUSSION

A. *Summary Judgment Standard*

The purpose of summary judgment is to avoid a pointless trial in cases where it is unnecessary and would only cause delay and expense. *Goodman v. Mead Johnson & Co.*, 534 F.2d 566, 573 (3d Cir.1976), cert. denied, 429 U.S. 1038 (1977). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).

The party moving for summary judgment has the initial burden of showing the basis for its motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant adequately supports its motion pursuant to Rule 56(c), the burden shifts to the nonmoving party to go beyond the mere pleadings and

present evidence through affidavits, depositions, or admissions on file to show that there is a genuine issue for trial. *Id.* at 324. A genuine issue is one in which the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

*\*3* When deciding a motion for summary judgment, a court must draw all reasonable inferences in the light most favorable to the nonmovant. *Big Apple BMW, Inc. v. BMW of N. Am., Inc.,* 974 F.2d 1358, 1363 (3d Cir.1992), *cert. denied,* 507 U.S. 912 (1993). Moreover, a court may not consider the credibility or weight of the evidence in deciding a motion for summary judgment. *Id.* Nonetheless, a party opposing summary judgment must do more than rest upon mere allegations, general denials, or vague statements. *Trap Rock Indus., Inc. v. Local 825,* 982 F.2d 884 (3d Cir.1992).

B. *Standing*

The O'Briens seek injunctive relief under section 12188(a) of the ADA, as compensatory damages are not available under section 12188(a). Werner has challenged the O'Briens' standing to sue for injunctive relief under the ADA.

"It goes without saying that those who seek to invoke the jurisdiction of the federal courts must satisfy the threshold requirement imposed by Art. III of the Constitution by alleging an actual case or controversy." *Lyons v. City of Los Angeles,* 461 U.S. 95, 101 (1983). The Supreme Court has established that the irreducible constitutional minimum of standing contains three elements: (1) the plaintiff must have suffered an "injury in fact"; (2) there must be a causal connection between the injury and the conduct complained of; and (3) it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. *Lujan v. Defenders of Wildlife,* 112 S.Ct. 2130, 2136 (1992). The party invoking federal jurisdiction bears the burden of establishing the elements of standing. *Id.*

The Supreme Court has held that an injury in fact must " 'be actual or imminent, not 'conjectural' or 'hypothetical.' " *Id.* Moreover, when a plaintiff seeks an injunction based upon a past wrong, " '[p]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief ... if unaccompanied by any continuing, present adverse effects.' " *Lyons,* 461 U.S. at 102 (alterations in original). Past wrongs are merely evidence "bearing on 'whether there is a real and immediate threat of repeated injury.' " *Id.*

In *Lyons,* for example, the plaintiff alleged that officers of the Los Angeles Police Department ("LAPD") stopped him for a traffic violation and, although he offered no resistance, the officers subjected him to a choke hold, damaging his throat. *Lyons,* 461 U.S. at 97-98. Plaintiff sought an injunction barring the LAPD from using choke holds except in situations where its officers were threatened with deadly force. *Id.* at 98. Despite the plaintiff's allegations that the LAPD routinely applied choke holds in situations that did not involve deadly force, the Supreme Court found that the plaintiff did not have standing to sue for injunctive relief because the plaintiff could not show that there was a real and immediate threat that he would again be stopped for a traffic violation and, if he was, that his injury would be repeated. *Id.* at 105-06.

*\*4* Recent cases have applied the injury in fact requirement of standing articulated in *Lyons* and *Lujan* to bar plaintiffs' claims brought under the ADA. In the cases of *Hoepfl v. Barlow,* 906 F.Supp. 317 (E.D.Va.1995); *Schroedel v. New York Univ. Medical Ctr.,* 885 F.Supp. 594 (S.D.N.Y.1995); *Atakpa v. Perimeter Ob-Gyn Assocs. P.C.,* No. 92-CV-2459, 1994 WL 874202 (N.D.Ga. Sept. 30, 1994); and *Aikins v. St. Helena Hosp.,* 843 F.Supp. 1329 (N.D.Cal.1994); plaintiffs were discriminated against by the defendants, medical care providers, in violation of the ADA. Nonetheless, the courts held that plaintiffs did not have standing to bring their ADA claims because they could not show a substantial likelihood that they would use the services of the medical care providers again or that, if they did, there was a real and immediate threat that the medical care providers would again discriminate against them. *Hoepfl,* 906 F.Supp. at 320-21; *Schroedel,* 885 F.Supp. at 599; *Atakpa,* 1994 WL 874202, at *4-5; *Aikins,* 843 F.Supp. at 1333-34.

C. *Application of the Law to the Case*

The Court agrees with Werner that there is no real and immediate threat that the O'Briens will be subject to repeated injury by Werner. The O'Briens have not shown that they are likely to use Werner buses in the near future or, if they do use them, that Werner is likely to violate their rights under the ADA again.

First, the O'Briens have not shown that they are likely to use Werner buses in the near future. The record lacks both any specific allegations by the O'Briens that they are likely to use Werner buses in the near future and any evidence from which the Court may draw a reasonable inference that such use is likely. The record does not show, for example, that the O'Briens used Werner tour buses regularly, or even on occasion, prior to November 13, 1992. Indeed, the record shows that the only reason that the O'Briens purchased tickets for a Werner tour bus on November 13, 1992 was that they had won concert tickets from a radio station. Therefore, the circumstances under which the O'Briens purchased their tickets for a Werner bus demonstrate that their use of a Werner bus was an isolated, chance event. This conclusion is strengthened by the O'Briens' testimony. Both the O'Briens testified that they were not aware of any incidents, other than the one involving themselves, in which a disabled person was refused admittance to a Werner bus. (O'Brien Dep. at 87; Burk-O'Brien Dep. at 58-59, 185-86). In fact, Mr. O'Brien testified, "Outside of our incident, I know nothing about Werner Bus." (O'Brien Dep. at 87). This testimony further indicates that the O'Briens had not used Werner buses prior to November 13, 1992.[FN2] Finally, the Court notes that the O'Briens have returned the free tickets offered by Werner. Accordingly, the Court is unable to draw a reasonable inference that the O'Briens are likely to use Werner buses in the near future.

> FN2. If the O'Briens had used Werner buses prior to the date of their incident, then their testimony indicates that they were not discriminated against in their prior experiences with Werner. This conclusion would strengthen the next part of the Court's analysis below, finding that the O'Briens have not shown that there is a substantial likelihood that Werner will violate the rights of the O'Briens under the ADA again.

*5 Second, even if the O'Briens could show that they were likely to use Werner buses in the near future, the O'Briens have not shown that Werner is likely to violate their rights under the ADA again. After the incident with the O'Briens, Werner responded by apologizing to the O'Briens, both privately and publicly, and by addressing the issue with its drivers through a memorandum, through individual communication, through discussions at drivers' meetings, and through the inclusion of Werner's policy in its drivers handbook. In addition, Werner invited the Montgomery County Association for the Blind and the O'Briens to address its drivers and cooperated with the ICC and PHRC with their investigations of the O'Briens' incident. Werner's immediate recognition of its error and efforts to take corrective measures demonstrate that Werner is responsive to its obligations under the ADA. It is significant that, as admitted by the O'Briens, there is no evidence in the record of any incident of discrimination by Werner other than that of the O'Briens.[FN3] In addition, the Court notes that Werner has had experience transporting blind persons and their guide dogs on charter buses without trouble. Therefore, the Court does not believe that there is a substantial likelihood that Werner will violate the O'Briens' rights under the ADA again.

> FN3. The O'Briens argue that Werner discriminates against blind persons because it operates a segregated bus company. In support of this claim, the O'Briens refer to a statement passed on to them by the policeman who talked to Mr. Brynan that Werner would send another bus for them and to the charter buses that Werner has operated for blind associations. First, to the extent that the information communicated by the policeman was correct, it was part of Werner's mishandling of the incident. There is no evidence in the record that Werner has a policy of providing separate tour buses for disabled persons. Second, the O'Briens misunderstand or ignore the testimony of Mr. Ochroch explaining the nature of charter buses. Unlike a tour bus, whose itinerary is organized by Werner and whose tickets are sold to the public, a charter bus is organized by a private group of people who hire Werner to transport them. (Ochroch's Dep. at 48-50). Thus, operating charter buses for blind associations does not constitute discrimination or segregation. Contrary to the O'Briens argument, *not* accepting charters from blind associations, while accepting them from other groups, would constitute discrimination.

The O'Briens argue that a risk of future harm exists because Werner's efforts, including the distribution of a memorandum, discussion of Werner's policy at semiannual drivers meetings, and amendment of

Werner's drivers handbook, are insufficient steps taken by Werner to train its drivers. In addition, the O'Briens also argue that a risk of future harm exists because Werner has failed to comply with various regulations promulgated under the ADA.[FN4]

> FN4. Specifically, the O'Briens argue that Werner has failed to adequately train its drivers to ensure that the following regulations of the ADA are followed: (1) that drivers permit guide dogs on Werner buses; (2) that drivers provide adequate time for individuals with disabilities to complete boarding or disembarking from Werner buses and, if needed, assist individuals with disabilities in boarding or disembarking from Werner buses; (3) that drivers take measures to ensure that individuals with disabilities have a priority seat, or in cases involving wheelchairs, a securement location; (4) that drivers provide means by which individuals with disabilities can identify the proper bus to enter where more than one bus route serves the same stop; and (5) to the extent that Werner operates a fixed route system, that drivers announce major intersections and destination points along a route sufficient to allow individuals with disabilities to be oriented to their location. In addition, the O'Briens argue that Werner has failed to comply with the ADA by failing to ensure that adequate information concerning transportation services, such as schedules, are made available to individuals with disabilities and by failing to provide a Braille or TTD communication device for individuals with disabilities to communicate with Werner. The O'Briens cite 28 C.F.R. § 36.303(d) and 49 C.F.R. §§ 37.167(b), 37.167(c), 37.167(f), 37.167(i), 37.167(j)(1), 37.169(b).

The O'Briens fail to offer any support for their contentions that Werner's efforts to train its drivers is insufficient or that Werner is likely to violate the regulations that the O'Briens cite. Instead, the O'Briens rely on Werner's failure to produce certain evidence-for example, the O'Briens contend that Werner has failed to provide the testimony of a single driver that he or she has read Werner's drivers handbook or has otherwise been trained.

The O'Briens misunderstand their burden of production. In a summary judgment motion, once the moving party has adequately supported its motion, the burden shifts to the non-moving party to produce evidence that contradicts that of the moving party. Here, Werner has provided evidence of its efforts to instruct its drivers on its non-discrimination policy regarding disabled individuals. The burden thus shifts to the O'Briens to provide evidence that these efforts are inadequate-for example, by showing that incidents of discrimination have occurred following Werner's efforts, by adducing expert testimony of the inadequacy of Werner's efforts, or by showing a pattern of past conduct so permeated with discrimination that the inadequacy of simple corrective procedures is obvious. It is well-settled, however, that the O'Briens cannot rely on mere allegations and general denials, as they have done here. *Lujan,* 112 S.Ct. at 2137; *Trap Rock Indus., Inc. v. Local 825,* 982 F.2d 884 (3d Cir.1992). As the Supreme Court explained in *Lujan:*

*\*6 Since [the standing elements] are not mere pleading requirements but rather an indispensable part of the plaintiff's case, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation.... In response to a summary judgment motion, ... the plaintiff can no longer rest on ... 'mere allegations,' but must 'set forth' by affidavit or other evidence 'specific facts,' which for purposes of the summary judgment motion will be taken as true.

*Lujan,* 112 S.Ct. at 2137 (citation omitted).

Since the O'Briens have not met their burden of production, the O'Briens have not shown that they have standing to bring their ADA claim.

D. *PHRA Claim*

Because the Court grants summary judgment on the O'Briens' federal claim under the ADA, the Court exercises its discretion to dismiss the O'Briens' supplemental state claim under the PHRA. *See Henglein v. Informal Plan for Plant Shutdown Benefits,* 974 F.2d 391, 398 (3d Cir.1992) ("[I]t is well settled that,

after disposal of a federal claim, a district court has discretion to hear, dismiss, or remand a supplemental claim for which there is no independent basis for federal subject matter jurisdiction.").

### III. *CONCLUSION*

For the foregoing reasons, defendants' motion is granted. The Court's Final Judgment follows.

### FINAL JUDGMENT

AND NOW, this 26th day of February, 1996, upon consideration of the Defendants' Motion for Summary Judgment, IT IS HEREBY ORDERED that the Defendants' Motion is GRANTED.

IT IS FURTHER ORDERED that JUDGMENT is entered in favor of the Defendants and against the Plaintiffs on Counts I, II, and III of the Plaintiffs' Complaint, and the supplemental state claim under PHRA is DISMISSED.

E.D.Pa.,1996.
O'Brien v. Werner Bus Lines, Inc.
Not Reported in F.Supp., 1996 WL 82484 (E.D.Pa.), 64 USLW 2596, 5 A.D. Cases 444, 14 A.D.D. 634, 7 NDLR P 417

Motions, Pleadings and Filings (Back to top)

- 2:94cv06862 (Docket) (Nov. 12, 1994)
END OF DOCUMENT

(C) 2007 Thomson/West. No Claim to Orig. US Gov. Works.